Michael F. Lynch
Nevada State Bar No. 8555
Lynch Law Practice, PLLC
3613 S. Eastern Ave.
Las Vegas, Nevada 89169
Telephone: (702) 684-6000
Fax: (702) 543-3279
Michael@LynchLawPractice.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

Tonkawa Tribe of Indians of
Oklahoma d/b/a Tonkawa
Enterprises )
on behalf of itself and others )
similarly situated, )          Case Number _____
 )
          Plaintiff, )
 )          Class Action For
          vs. )          Damages
 )
Scientific Games Corporation, )
Bally Technologies, Inc., and Bally )          JURY DEMAND
Gaming, Inc., )
 )
          Defendants. )

Plaintiff on behalf of itself and similarly situated United States regulated casinos have been harmed in their business or property by virtue of Defendants' monopolization of a United States relevant market for the sale of automatic card shuffling machines for regulated casinos ("card shuffling relevant market") and attendant monopoly overcharging by Defendants.

## NATURE OF ACTION

1.     This matter is closely related to an action brought against Defendants by their competitors. *Shuffle Tech International LLC et al. v Scientific Games Corp. et al.*, No. 1:15-cv-3702 (N.D. Ill.) ("*Shuffle Tech Litigation*"). On August 8, 2018 the Court entered judgment on a jury verdict against Defendants for $315 million in total to compensate them for their lost profits

materially caused by Defendants' monopolization of the card shuffling relevant market. Ex. B.

2.      At trial the Defendants' competitors established that they invented and attempted to bring to market an innovative card shuffling machine and were prevented from doing so by the Defendants, which filed multiple sham litigations in an attempt to enforce invalid patents obtained by committing a fraud on the U.S. Patent and Trademark Office ("PTO"). The competitors established that, as a consequence, Defendants have unlawfully monopolized the card shuffling relevant market and forced them out of the market.

3.      Pursuant to the Court's jury instructions the jury is presumed to have made the following findings: (a) "automatic card shuffling machines for regulated casinos in the United States is a relevant market"; (b) "the [D]efendants had monopoly power in that market"; (c) "the [D]efendants willfully acquired or maintained monopoly power by anticompetitive conduct"; (d) "the [D]efendants' anticompetitive conduct occurred in or affected interstate commerce"; and (e) "the [D]efendants' anticompetitive conduct harmed consumers." Ex. A.

4.      Defendants are precluded from relitigating these issues here, and as a consequence, they are also precluded from relitigating the jury's ultimate finding that they have violated the antitrust laws by monopolizing the card shuffling relevant market and harming competition as of August 8, 2018, the date judgment was entered in the *Shuffle-Tech Litigation*.

**PARTIES**

5.      Plaintiff Tonkawa Tribe resides in Kay County in Northern Oklahoma. It is headquartered on the west bank of the Chickaskia River about 2.5 miles southeast of the town of Tonkawa, Oklahoma. Through Tonkawa Enterprises the Tribe operates the Native Lights Casino and the Tonkawa Hotel and Casino. It has leased or purchased several automatic card shuffling machines directly from Defendants from September 2016 -to the present.

6.     Defendant Scientific Games Corporation ("SGC") is a Delaware corporation with a corporate office in Las Vegas, Nevada.

7.     Defendant Bally Technologies, Inc. is, or was, on information and belief, a Nevada corporation with offices located in Las Vegas, Nevada. On November 21, 2014, Bally was acquired by, and its operations taken over by, SGC.

8.     Defendant Bally Gaming, Inc. ("BGI") is or was a Nevada corporation with offices located in Las Vegas, Nevada. BGI is or was a subsidiary of Bally Gaming International, Inc.

**JURISDICTION AND VENUE**

9.     This action arises under the antitrust and patent laws of the United States, particularly Section 2 of the Sherman Act, 15 U.S.C.§ 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; the United States Patent Code, 35 U.S.C. §§ 102, 103, 114, 283, and 285; and § 1.56 of Title 37 of the Code of Federal Regulations ("CFR").

10.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15, 26, and 1121 and 28 U.S.C. §§ 1331, 1337, and 1338.

11.     This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. § 22; 28 U.S.C. §§ 1391(b) and (c) since the Defendants regularly conduct business in this state and district, "reside" in this jurisdiction, engaged in anticompetitive conduct in this jurisdiction; and the impact of the violations alleged has been the lessening of competition in the card shuffling relevant market in part in this district.

12.     Defendants have a regular and established business in this district, are found in this district, have agents in this district and have well more than "minimum contacts."

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2), (c)(2), and (d); and 15 U.S.C. §§ 15 and 26, because, *inter alia*, the Defendants are subject to personal jurisdiction in this state and district, and therefore reside in this state and district, and a substantial

part of the events giving rise to the claims asserted herein arose in this state and district, as further detailed in the following paragraphs.

**EXCLUSIONARY CONDUCT**

14. Should this Court determine in some respect that issue preclusion does not pertain to establish Defendants' monopolization violation, Plaintiff would show the Court as follows:

15. In 1983, John Breeding started SHFL Entertainment, Inc. ("SHFL"), a company to manufacture automatic playing card shufflers for use in casinos. By 2012, SHFL had released multiple different models of automatic card shufflers and obtained approximately 253 patents related to shuffler technology. In 2013 Bally Technologies acquired SHFL, and in 2015 Defendant SGC acquired Bally Technologies. Defendant Bally Gaming is a subsidiary of Bally Technologies and operates under the Scientific Games brand. It is responsible for manufacturing equipment and games for casinos in the United States. Collectively herein Defendants are referred to as "SHFL."

16. Defendants have misused two of SHFL's patents: the '982 patent and the '935 patent. In April 2002 SHFL filed the application for the '982 patent based on a new model of an automatic shuffler known as the Deckmate 1. According to SHFL, the Deckmate 1 is an advance over other automatic shufflers based on the technology it uses to receive cards and return them to the dealer. The Deckmate 1 is installed under the gaming table, with its upper surface flush with the surface of the table. It also uses an elevator to move the cards from beneath the table where they are randomized to the top of the table for use. The elevator has a cover that moves automatically to return the cards to the dealer. During the prosecution, SHFL disclosed many other patents as prior art. The PTO issued the '982 patent in November 2003.

17. In October 2003 SHFL filed an application for what eventually became the '935 patent, also based on the Deckmate 1.

18.     In October 2012 DigiDeal Corporation ("DigiDeal") displayed the DigiShuffle prototype at a gaming show in Nevada, which SHFL employees attended. These employees saw the prototype and SHFL then filed suit against DigiDeal in the District of Nevada, alleging that the DigiShuffle infringed the '982 and '935 patents.

19.     In January 2014 DigiDeal initiated re-examination proceedings before the PTO on claims 1–3 and 42–46 of the '982 patent, and claims 1, 2, 9–11, and 14 of the '935 patent. In August 2014, the PTO rejected claims 1–3 and 42–46 of the '982 patent based on the Block '044 patent, *infra* ¶ 34, and the Roblejo '122 patent, *infra* ¶¶ 32-33. SHFL then amended its claims to state that the shuffler must be mounted flush with a recessed support surface beneath the table cover and a cover set flush into the shuffler's top surface over the elevator, features not taught by the Block patent. The PTO agreed that the Block patent taught away from SHFL's invention as described in the amended claims, because the Block device prevents anyone from physically touching the cards and does not teach a shuffler that has a top surface mounted flush with the gaming table surface. On May 2015, the PTO confirmed that the claims in the '982 patent were patentable, and it issued a reexamination certificate in July 2015.

20.     During the '935 reexamination the PTO also rejected some of the claims in the '935 patent after determining that they were obvious based on the Block '044 patent and combinations of the Roblejo '122 patent with other patents. The PTO indicated that the material in the '935 patent was obvious in light of the disclosure in the Roblejo '122 patent of an automatic shuffler and another reference that described a mah-jongg block shuffler mounted to a gaming table and recessed beneath its surface. The PTO also indicated that the Block patent teaches an automatic shuffler mounted to a gaming table and therefore that it "teaches the limitations deemed to be missing from the prior art during the original prosecution of the '935 patent." SHFL then cancelled

all of the reexamined claims from the '935 patent "in order to expedite the issuance of a reexamination certificate."

21.     In April 2015 the *Shuffle Tech* Plaintiffs filed suit against Defendants SHFL. In an amended complaint Plaintiffs alleged that SHFL had violated Section 2 of the Sherman Act by procuring two patents using fraud on the PTO and then engaging in sham litigation asserting baseless claims against its competitors.

22.     In June 2015 SHFL filed a notice of concurrent proceedings with the PTO in which it attached a copy of the *Shuffle Tech* complaint. The notification indicated that SHFL had determined it had no obligation to submit the references mentioned in plaintiffs' complaint because it had already determined that they were either cumulative, already made of record, or not a patent or publication. In July and August 2015, the PTO issued reexamination certificates for the '982 and '935 patents.

## SHFL Infringement Litigation

23.     **CARD Litigation.** In 2002 Casino Austria Research and Development in Vienna ("CARD") began importing into the United States an automatic shuffler known as the "one2six." In May 2003 CARD filed suit in federal court in Nevada against SHFL requesting a declaratory judgment that its shuffler did not infringe two of SHFL's patents, neither of which is at issue in this case. SHFL filed a counterclaim alleging infringement of those patents as well as one other. During the litigation CARD argued that SHFL's patents were invalid because they were anticipated by the Nicoletti shuffler, the Luciano prototype, and the Roblejo prototype. Atilla Grauzer, an engineer at SHFL, submitted a declaration in that case on behalf of SHFL in which he disputed this contention as to each reference. Both Grauzer and Mark Litman, SHFL's outside patent prosecution counsel, attended the deposition of CARD's technical expert, Joel Greenberg, who opined that the Luciano and Roblejo prototypes anticipated SHFL's patents. Toward the end of the litigation, either SHFL

or its counsel at the time created what the parties here refer to as the shuffler art discs, which contained documents from the CARD litigation and technical information on the pieces of allegedly invalidating prior art.

24. In June 2004 SHFL and CARD voluntarily dismissed the Nevada case following a settlement agreement in which SHFL acquired CARD. Litman and Jennifer Farrar, SHFL's in-house intellectual property counsel, then filed copies of the shuffler art discs in multiple pending patent applications before the PTO. SHFL did not file a copy of the disc as part of the then-pending '935 application. It did represent in amendments filed with a different patent application related to shuffler technology that both in-house and outside prosecution counsel for SHFL were "in the time-consuming process of reviewing documents . . . that are the result of litigation between [SHFL] and third parties."

25. **The DigiDeal Suit.** In October 2012 DigiDeal displayed the DigiShuffle prototype at a gaming show in Nevada, which SHFL employees attended. These employees saw the prototype and SHFL then filed suit against DigiDeal in the District of Nevada, alleging that the DigiShuffle infringed the '982 and '935 patents.

26. In January 2014 DigiDeal initiated re-examination proceedings before the PTO on claims 1–3 and 42–46 of the '982 patent, and claims 1, 2, 9–11, and 14 of the '935 patent. Alan Fanucci acted as lead counsel for SHFL in the reexamination proceedings and received assistance from Howard Shin and Kimball Anderson. In August 2014, the PTO rejected claims 1–3 and 42–46 of the '982 patent based on the Block '044 patent and the Roblejo '122 patent. SHFL then amended its claims to state that the shuffler must be mounted flush with a recessed support surface beneath the table cover and a cover set flush into the shuffler's top surface over the elevator, features not taught by the Block patent.

27.    The PTO agreed that the Block patent taught away from SHFL's invention as described in the amended claims, because the Block device prevents anyone from physically touching the cards and does not teach a shuffler that has a top surface mounted flush with the gaming table surface. On May 2015, the PTO confirmed that the claims in the '982 patent were patentable, and it issued a reexamination certificate in July 2015.

28.    During the '935 reexamination, the PTO also rejected some of the claims in the '935 patent after determining that they were obviously based on the Block '044 patent and combinations of the Roblejo '122 patent with other patents. The PTO indicated that the material in the '935 patent was obvious in light of the disclosure in the Roblejo '122 patent of an automatic shuffler and another reference that described a mah-jongg block shuffler mounted to a gaming table and recessed beneath its surface. The PTO also indicated that the Block patent teaches an automatic shuffler mounted to a gaming table and therefore that it "teaches the limitations deemed to be missing from the prior art during the original prosecution of the '935 patent." SHFL then cancelled all of the reexamined claims from the '935 patent "in order to expedite the issuance of a reexamination certificate." PTO issued reexamination certificates for the '982 and '935 patents.

## **Prior Art Known to SHFL**

29.    With fraudulent intent SHFL failed to disclose relevant pieces of prior art described below during the prosecutions and reexaminations of the '982 and '935 patents.

30.    **Nicoletti Shuffler.** In September 1990 a New Jersey newspaper named The Courier-Post published an article about Adolph Nicoletti and an automatic shuffler he had invented. The article described the shuffler as "installed under a blackjack table" and included an image of the installed machine. *Id*. It also stated that Nicoletti had conducted a test run of his machine by installing it in a casino in Atlantic City. The test run ended after one week due to malfunctions. Breeding testified that he knew of a shuffler in Atlantic City that was "so big it was

built under the table and cards would go down inside," but he never saw it and does not know who manufactured it. Breeding stated that the patent holder for the machine called him with an offer to sell the technology but that he turned it down.

31. **Luciano Prototype.** Around July 1992 Lawrence Luciano developed a prototype of an automatic shuffler for his company, Luciano Packaging, Inc., as a result of a development agreement with International Game Technology, Inc. ("IGT"). In November 1993, IGT cancelled the development agreement. Luciano then began marketing his prototype shuffler (the Luciano prototype) to casinos and other potential customers. He made a promotional video that showed the prototype in operation, which he provided to anyone in the industry who expressed interest.

32. **Roblejo Prototype.** In October 1997 SHFL participated in the World Gaming Expo in Nevada. Various SHFL executives and employees attended the expo, including Grauzer and Farrar, who were sent there to monitor competitive activity. At the expo another company named Casino Concepts displayed a prototype of an automatic shuffler invented by Dr. Conrad Roblejo called the Sure-Shuffler ("Roblejo prototype"). During the expo Halvard Solberg, who was hired by Casino Concepts to provide technical support at the expo, gave a very detailed demonstration of the Roblejo prototype to individuals he later learned were representatives of SHFL. The demonstration required Solberg to open the top cover and eventually remove side panels in order to answer specific technical questions. An executive at Casino Concepts later wrote a memo to Dr. Roblejo, in which he stated that "during the entire show people from [SHFL] looked at our equipment." He stated that Casino Concepts representatives spoke with SHFL's original designer, vice president of finance, and other unidentified employees.

33. Farrar says that she visited a Casino Concepts booth at an expo in the early years of her career at SHFL but does not recall if it was in 1997. She observed a machine on the table but did not know what it was or how it operated, as there was no one manning the booth at the

time. SHFL's file on the expo contains a copy of a brochure of the Roblejo prototype displayed at the 1997 expo. Grauzer testified that he has never seen the Roblejo prototype at all, much less the interior of the machine. Grauzer's files contain a report on the 1997 expo, which discusses the Roblejo prototype and includes a marketing brochure. Grauzer maintains that he did not write this report and could not possibly have done so because it contains non-technical information as well as bullet points, which he does not know how to create. Donald Barnett, a former SHFL employee, testified during a deposition that Grauzer would have been the person SHFL relied upon to analyze competition at trade shows. Barnett stated that Grauzer is the only individual who would have written a report analyzing competition seen at a trade show. Another former SHFL employee, Robert Pietrosanto, agrees that Grauzer would have been the only individual working for SHFL at the time who was qualified to analyze a competitive product.

34. **Block Patent.** The Block '044 patent, issued by the PTO in March 2002, discloses an automatic card shuffling and dealing system that includes a shuffling device under the gaming table and an elevator that delivers the shuffled cards to the table surface. SHFL disclosed this patent in the specifications of four patent applications it submitted in July 2003 as well as during the course of the prosecution of the '935 patent. The company did not disclose the Block '044 patent in the application for the '982 patent.

**Defendants' Failures to Disclose Prior Art Before the PTO**

35. Defendants' omissions, selective disclosure, and misrepresentations relating to prior art support a finding of intent to defraud the PTO in the prosecution of the '982 and '935 patents and in the reexamination of these patents.

**'982 Patent**

36. SHFL acted with fraudulent intent by failing to disclose the Block '044 patent during prosecution of the '982 patent. Those involved in the prosecution of the '982 patent were

generally aware of the Block '044 patent because SHF disclosed this reference in four other patent specifications filed during the same time period.

37.     Further, SHFL was aware of the materiality of the Block '044 patent to the '982 prosecution. Two of the four patent applications in which SHFL cited the Block '044 patent were continuations-in-part of the application ("CIP") for the '982 patent which supports an inference that the Block patent was also relevant to the '982 patent. Further, SHFL stated in the specification of its '099 patent -- a patent that was not a CIP of the '982 patent but dealt with automatic shuffling technology -- that the Block '044 patent "describes a top of a card table with a card-dispensing hole there through and an arcuate edge is covered by a transparent dome shaped cover." And during prosecution of the '982 patent, the PTO initially rejected a number of the claims based on other pieces of prior art that also taught the use of a cover over an elevator.

38.     In response, SHFL distinguished its invention by stating that it alone disclosed an automatically moveable cover. Thus SHFL was aware both that the Block '044 patent disclosed a cover and that the cover was a key feature of the '982 patent.

39.     Although SHFL's citation to Block in the '099 patent did not expressly mention an automatically moveable cover, Block clearly discloses this feature. Further, the description of the preferred embodiment of the Block '044 patent states that it has a motor that "is operable to cause the cover to cover and uncover the card dispensing hole in response to a signal from a computer." And during reexamination of the '982 patent, the PTO found that the Block '044 patent did in fact disclose an automatically moveable cover. Thus there is a nexus between the disclosures of the Block '044 patent and the (claimed) point of novelty of the '982 patent. SHFL knew that the Block '044 patent disclosed an automatically moveable cover, a key feature of the '982 patent, and yet failed to disclose this reference to the PTO to deceive the PTO.

**'935 Patent**

40.     SHFL also fraudulently omitted the Nicoletti, Luciano, and Roblejo references during the prosecution of the '935 patent, which lasted from October 2003 until April 2009. SHFL was aware of all three of these prior art references and their materiality prior to October 2003. In 2003 SHFL sued CARD for infringement of three of its shuffler technology patents. In response, CARD argued that the patents were invalid as anticipated by the Nicoletti Shuffler, the Roblejo prototype, and the Luciano prototype. SHFL was aware that these references were relevant to its shuffler technology. Grauzer was also aware of the Luciano and Roblejo prototypes because he submitted an expert declaration in which he explained how these references do not anticipate SHFL's patents. Further, near the end of the suit, SHFL prepared multiple discs containing all the documents from the CARD litigation discussing these references as well as information regarding their operation and that Farrar and Litman discussed these disks. Although SHFL submitted copies of the discs to the PTO in connection with a number of then-pending patent applications, it did not submit the disc in connection with the '935 prosecution.

41.     SHFL's selective disclosure of the discs indicates deceptive intent. The '935 patent does in fact cover the compartment shuffling method. SHFL chose not to disclose these references in the '935 prosecution despite the fact that the device in the '935 patent possessed the same features as other devices in which SHFL disclosed the discs.

42.     Further, SHFL knowingly misrepresented the state of the prior art to the PTO during prosecution. SHFL made a number of statements during prosecution regarding the novelty of the device in the '935 patent that were directly contradicted by the references that SHFL had in its possession as a result of the CARD litigation. This lack of candor supports an inference of fraudulent intent. SHFL intended to defraud the PTO by omitting these references from the prosecution.

### Reexamination of the '982 and '935 Patents

43.    SHFL engaged in fraud on the PTO during reexamination of both the '982 patent and the '935 patent by failing to disclose the Nicoletti, Roblejo, and Luciano references. Reexamination of both patents began in January 2014, almost ten years after the CARD litigation and SHFL's creation of the discs containing the prior art. Thus SHFL was aware of the references prior to reexamination.

44.    SHFL acted with fraudulent intent in omitting the references. In an effort to distinguish its inventions as patentable, SHFL made a number of statements during prosecution that are directly contradicted by the omitted references. SHFL omitted these references with the intent to defraud the PTO into granting an otherwise invalid patent.

### SHFL Sham Litigation

45.    Prior to its suit against DigiDeal, SHFL filed sham patent infringement litigation lawsuits against every other competitor in the card shuffling relevant market, then acquired their assets at a discount after they had been weakened by the litigation, or drove them out of the market with the threat of litigation expenses which small start-up operations could not afford. These litigations include: (a) an action against CARD LLC in 2003-2004 followed by an acquisition of CARD by SHFL in 2004; (b) a suit against VendingData in 2004-2009, followed by VendingData's acquisition by SHFL in 2009; (c) a suit against Taiwan Fulgent it 2009-2010; and (d) a suit against TCS Huxley in 2012-2013, similarly resulting in TCS's departure from the market.

### ISSUE PRECLUSION

46.    The jury in the *Shuffle Tech Litigation* was instructed that it should find that Defendants had engaged in unlawful monopolization if it made the following findings: (a) "automatic card shuffling machines for regulated casinos in the United States is a relevant market"; (b) "the [D]efendants had monopoly power in that market"; (c) "the [D]efendants willfully

acquired or maintained monopoly power by anticompetitive conduct"; (d) "the [D]efendants' anticompetitive conduct occurred in or affected interstate commerce"; and (e) "the [D]efendants' anticompetitive conduct harmed consumers." Ex. A at 14-23 (jury instructions); Ex. B (judgment). Defendants ineffectively sought to vacate the judgment by agreement with the competitor plaintiffs while the matter was on appeal.

47. These findings were essential to the jury's verdict and the judgment entered on this verdict. These issues were actually litigated and Defendants were fully and fairly represented.

48. Therefore they are precluded from relitigating these findings and as a consequence are precluded from relitigating that that they have violated the antitrust laws by monopolizing the United States card shuffling relevant market as of August 8, 2018, the date judgment was entered in the *Shuffle-Tech Litigation*.

49. As a consequence direct purchasers of Defendants' card shuffling machines in the proposed Class need only show this Court that they have been materially injured by Defendants' monopolization in their business or property by paying monopoly pricing on purchases directly from Defendants (or otherwise), and the amount of their actual damages.

**RELEVANT MARKET**

50. Casinos routinely use automatic card shuffling machines on gaming tables to automate the historically labor-intensive process of shuffling physical playing cards between each hand of play. The relevant product market is the market for the sale or lease of these card shufflers certified and approved for use by casinos, excluding card shufflers designed for private consumer use in unregulated environments and also excluding card shufflers that randomize virtual "cards" in video-based games. The relevant geographic market is the United States.

**MARKET POWER**

51.     Defendants have been very successful in their efforts to monopolize the card shuffling relevant market. They now control virtually 100% of the relevant market. They also dominate the global market as well, with slightly less than 100% market share worldwide.

52.     In addition to forcing all actual competitors out of the market, SHFL's, and now SGC's, lengthy pattern of predatory, vexatious patent litigation has effectively raised a substantial artificial barrier to entry for all potential competitors as well as excluded competitors. As a result no potential competitor can enter the relevant market without a multi-million dollar war chest and a business plan that includes millions in upfront litigation costs as part of its anticipated start-up expense.

**ANTITRUST INJURY IN FACT**

53.     As of August 18, 2018 the *Shuffle Tech* judgment establishes in part that the Defendants had monopolized the relevant market for automatic card shuffling machines for regulated casinos in the United States, possessed monopoly power in that market, and their anticompetitive conduct harmed consumers of these machines such as Plaintiff and other members of the purported Class. Throughout the damage period in the instant matter, beginning in September 2016, Defendants have harmed competition and inflicted antitrust injury on members of the proposed Class by charging them unlawful purchase and lease pricing well above competitive levels, as well as denying them competitive choice as to the use of automatic card shuffling machines.

## CLASS ACTION ALLEGATIONS

### Fed. R. Civ. Proc. 23(b)(3)

### Card Shuffler Damage Class

54.    Plaintiff brings this action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages on behalf of the following class ("Card Shuffler Damage Class").

Plaintiff represents a Class of all regulated United States casinos directly leasing or purchasing card shufflers from the Defendants on or after September 3, 2016.

### Rule 23(a) Prerequisites

55.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    The number of persons in the Class is in the hundreds, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)    There are numerous questions of law and fact arising from the pattern of Defendants' monopolization which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendants have engaged in monopolization and are estopped from defending otherwise; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted directly on members of the proposed Class and denied them freedom of product choice.

(c)    The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and

pervasive conduct.

(d)    The Class Representative and the Representative's counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

**Rule 23(b)(3) Prerequisites**

56.    In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)    Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

**Ascertainment of the Members of the Class**

57.    The members of the Class, and their payments to Defendants, can be easily ascertained through the Defendants' sales records.

**COUNT I**

58.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

59.    Defendants have monopolized the United States card shuffling relevant market in violation of Section Two of the Sherman Act, 15 U.S.C. § 2, and are precluded from relitigating such monopolization including its harm to consumer members of the proposed Class.

60.    Defendants by their exclusionary conduct have obtained and maintained market power in the United States relevant market and as a consequence have harmed competition by

charging above-competitive pricing, and denying competitive choice, to members of the proposed Class.

` **REQUESTS FOR RELIEF**

Plaintiff respectfully request the following relief:

A. That members of the Card Shuffler Damage Class recover damages equal to the difference between the prices they directly paid to Defendants for card shufflers and the competitive prices that would have prevailed in a relevant market but for Defendants' monopolization, trebled;

B. That Plaintiff be awarded the costs of suit, including reasonable attorneys' fees and expert fees; and

C. That Plaintiff be awarded pre- and post-judgment interest on all sums awarded, and other relief as the Court deems necessary and justified.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims alleged herein so triable.

Dated: September 3, 2020

Respectfully submitted,

**By:** */s/ Michael F. Lynch*

**Lynch Law Practice, PLLC**
Michael F. Lynch
Nevada Bar No. 8555
3613 S. Eastern Ave.
Las Vegas, Nevada 89169
Telephone: (702) 684-6000
Fax: (702) 543-3279
Michael@LynchLawPractice.com

**Fletcher Law, PLLC**
Zeke Fletcher
*(Petition Pro Hac Vice Forthcoming)*
124 W. Allegan, #1400
Lansing, MI 48933
Telephone: (517) 755-0776
Fax: (517) 913-6008
zfletcher@fletcherlawpllc.com

**Berry Law PLLC**
R. Stephen Berry
*(Petition Pro Hac Vice Forthcoming)*
1100 Connecticut Avenue, N.W.
Suite 645
Washington, D.C. 20006
Telephone: (202) 296-3020
Fax: (202) 296-3038
sberry@berrylawpllc.com

**Attorneys for Plaintiffs**

# **Exhibit A**

## INSTRUCTIONS TO THE JURY

## Shuffle Tech Litigation

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHUFFLE TECH INTERNATIONAL, LLC, ACES UP GAMING, INC., and POYDRAS-TALRICK HOLDINGS LLC,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 15 C 3702** |
| **SCIENTIFIC GAMES CORP.; BALLY TECHNOLOGIES, INC., d/b/a SHFL Entertainment or Shuffle Master, and BALLY GAMING, INC., d/b/a Bally Gaming and Systems,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**<u>INSTRUCTIONS TO THE JURY</u>**

Date:  August 6, 2018

Members of the jury, you have seen and heard all the evidence, and you are about to hear the arguments of the attorneys.  Now I will instruct you on the law.

You have two duties as a jury.  Your first duty is to decide the facts from the evidence in the case.  This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts.  You must follow these instructions, even if you disagree with them.  Each of the instructions is important, and you must follow all of them.  You must also continue to follow the instructions that I gave you at the start of the trial that you may not communicate about the case or about people involved in the case with anyone other than your fellow jurors until after you have returned your verdict.

Perform these duties fairly and impartially.  Each party to the case is entitled to the same fair consideration.

Do not allow sympathy, prejudice, fear, or public opinion to influence you.  You should not be influenced by any person's race, color, religion, national ancestry, age, or sex.

Nothing I am saying now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

To the extent that these instructions differ from the instructions that I read you at the beginning of the case, the instructions that I am giving you now are the ones that govern your consideration of this case.

1

The evidence consists of the testimony, the exhibits, and stipulations. A stipulation is an agreement between both sides that certain facts are true.

Certain testimony was presented to you by playing video recordings of deposition testimony. You should give this testimony the same consideration that you would give it if the witnesses had appeared and testified here in court.

The exhibits will be available to you to view via the computer and large screen that are present in the jury room.

The exhibits include the so-called "shuffler art" disks that have been discussed during the trial. If you wish to view the contents of these disks, please advise me by way of a note, and we will provide a laptop computer and instructions for viewing the contents of the disks.

In determining whether any fact has been proved, you should consider all of the evidence bearing on that fact, regardless of who offered the evidence.

You must make your decision based on what you recall of the evidence.  You will not have a written transcript to consult.

During the lawyers' closing arguments, you may hear or see them quote from excerpts of the transcript of the trial.  Keep in mind that you must consider all of the evidence, not just those portions quoted or referenced by the lawyers.

Certain things are not evidence.  I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded.  This includes any press, radio, Internet or television reports you may have seen or heard. Such reports are not evidence, and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence.  Lawyers have a duty to object when they believe a question is improper.  You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence.  Their purpose is to discuss the issues and the evidence.  If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

Any notes you have taken during this trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we sometimes look at one fact and conclude from it that another fact exists. In law we call this an "inference." A jury is allowed to make reasonable inferences, so long as they are based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

You are to consider both direct and circumstantial evidence. The law allows you to give equal weight to both types of evidence, but it is up to you to decide how much weight to give to any evidence in the case.

6

You must decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the witness's intelligence;

- the manner of the witness while testifying;

- the reasonableness of the witness's testimony in light of all the evidence in the case; and

- any inconsistent statements or conduct by the witness.

It is proper for an attorney to meet with any witness in preparation for trial.

You have heard witnesses who gave opinions about certain subjects. You do not have to accept the testimony of such a witness. You should judge it in the same way you judge the testimony of any other witness. In deciding how much weight to give to this testimony, you should consider each such witness's qualifications, how the witness reached his opinions, and the factors I have described for determining the believability of testimony.

Certain time lines, slides, charts, and summaries have been and will be shown to you to help explain other evidence that was admitted. These items are not themselves evidence or proof of any facts, so you will not have them during your deliberations. If they do not correctly reflect the facts shown by the evidence, you should disregard them.

The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

You may find the testimony of one witness or a few witnesses to be more persuasive than the testimony of a larger number of witnesses. You need not accept the testimony of the larger number of witnesses.

As I told you at the start of the trial, I imposed time limits on each side for its presentation of evidence and arguments. There were equal time limits for each side. Each side was free to use its allocated time as it wished and was free to question each witness for as long or as short as it wished, within its overall time limits.

**The parties and the claims**

The plaintiffs in this case are Shuffle Tech International, LLC, Aces Up Gaming, Inc., and Poydras-Talrick Holdings, Inc. I will refer to them as the plaintiffs. The plaintiffs also contend that any damages recoverable by DigiDeal Corporation have been assigned to Shuffle Tech.

The defendants in this case are Scientific Games Corp., Bally Technologies, Inc. (which does business under the names SHFL Entertainment or Shuffle Master), and Bally Gaming, Inc. I will refer to them as the defendants.

The lawsuit involves automatic card shuffling machines used in casinos. The plaintiffs contend that they invented and attempted to bring to market an innovative card shuffling machine. They contend that they were prevented from doing so by the defendants, which, according to the plaintiffs, filed a sham lawsuit to attempt to enforce invalid patents and pursued litigation on patents that had been obtained by committing a fraud on the U.S. Patent Office. The plaintiffs allege that by doing this, the defendants unlawfully monopolized the market for automatic card shuffling machines and forced the plaintiffs out of the market, causing monetary losses.

The defendants deny the plaintiffs' allegations. The defendants contend that they properly obtained patents for its automated card shuffling machines and that in doing so, they did not commit any fraud on the U.S. Patent Office. The defendants contend that they filed a lawsuit to enforce the patents because they believed that the plaintiffs' automatic shuffling machine copied parts of the defendants' patented invention and infringed the defendants' patents. The defendants also deny that the plaintiffs have been injured by the defendants' conduct.

11

**Preponderance of the evidence / clear and convincing evidence**

In these instructions, I will use the term "preponderance of the evidence." When I say that a party has to prove a proposition by a preponderance of the evidence, I mean that the party must persuade you that the proposition is more probably true than not true.

I will also use the term "clear and convincing evidence." When I say that a party has to prove a proposition by clear and convincing evidence, I mean that the party must persuade you that it is highly probable that the proposition is true. This is a higher standard of proof than preponderance of the evidence.

12

**The plaintiffs' claim**

To succeed on their claim, the plaintiffs must prove each of the following propositions:

1.      Automatic card shuffling machines for regulated casinos in the United States is a relevant market.

2.      The defendants had monopoly power in that market.

3.      The defendants willfully acquired or maintained monopoly power by anticompetitive conduct.

4.      The defendants' anticompetitive conduct occurred in or affected interstate commerce.

5.      The defendants' anticompetitive conduct harmed consumers.

6.      Plaintiffs were injured in their business or property by the defendants' anticompetitive conduct.

The plaintiffs must prove propositions 1, 2, 4, 5, and 6 by a preponderance of the evidence.  The plaintiffs must prove proposition 3 by clear and convincing evidence.

On the next several pages, I will define the terms "relevant market," "monopoly power," "anticompetitive conduct," "interstate commerce," and "harmed consumers."

13

**Definition of relevant market**

The term relevant market means a market in which products and services compete with each other in a particular geographic area. Products and services are considered to be in the same market if they are reasonable substitutes for each other, from the point of view of buyers or producers. They need not be identical. The basic test for whether products and services are reasonable substitutes for each other is whether changes in the price of one product or service would cause a considerable number of consumers to switch to another product or service.

**Definition of monopoly power**

Monopoly power is the power to control prices in a relevant market, or to exclude competition from that market.  A company has the power to control prices if it can set significantly higher prices for its products without suffering a substantial loss of business to competitors.  A company has the power to exclude competition if it has the ability to dominate a relevant market by eliminating competition or preventing new competition from entering the market.

**Definition of anticompetitive conduct**

Anticompetitive conduct is conduct without a legitimate business purpose, in other words, conduct that does not have a justification other than excluding competitors or limiting competition. The plaintiffs allege two different types of anticompetitive conduct in this case. They need not prove both of them to establish anticompetitive conduct; one is enough.

One type of anticompetitive conduct is knowingly attempting to enforce a fraudulently obtained patent. Establishing that a patent was obtained fraudulently requires the plaintiffs to prove by clear and convincing evidence that one or more persons involved in obtaining the patent intentionally withheld from the U.S. Patent Office information he or she knew was material, or deliberately misrepresented or falsified to the Patent Office information he or she knew was material. Information is material if it would have resulted in the denial of a patent if the Patent Office had known of the withheld or accurate information.

Another type of anticompetitive conduct is engaging in "sham" or bad faith litigation. This requires the plaintiffs to prove by clear and convincing evidence that the defendants pursued an objectively baseless lawsuit, as an attempt to interfere with the business relationships of a competitor through the litigation process. A lawsuit is objectively baseless only if no reasonable litigant could realistically expect success on the merits. It is not enough that the lawsuit was simply unsuccessful.

Obtaining a valid patent and enforcing it in good faith against a would-be competitor does not constitute anticompetitive conduct even if it results in the patent holder having monopoly power.

16

**Definition of prior art**

You have heard evidence regarding a patent-law term, "prior art."  Under United States patent law as applicable in this case, prior art includes the following:

- any product that was publicly known or used by others in the United States before April 23, 2002; or

- any product that was in public use in the United States more than one year before April 23, 2002; or

- any United States patent that was issued based on an application filed before April 23, 2002; or

- any product that was made before April 23, 2002 by anyone in the United States before April 23, 2002 who did not abandon, suppress, or conceal it.

17

**Evidence regarding certain findings made in Nevada lawsuit**

You have heard evidence regarding findings made by the judge in the Nevada lawsuit against DigiDeal in connection with DigiDeal's request to recover attorney's fees in that lawsuit. You may consider the judge's findings along with the other evidence in this case regarding whether the lawsuit against DigiDeal was objectively baseless. However, as I have previously instructed you, the judge's findings in the Nevada lawsuit are not binding on you.

18

**Definition of interstate commerce**

The term interstate commerce means commercial transactions that cross state boundaries.

**Definition of harm to consumers**

Consumers, in this case regulated casinos, are harmed by anticompetitive conduct if the conduct reduces the supply or quality of goods or services below what would have existed without the anticompetitive conduct, or if the conduct increases the price for goods or services above what it would have been without the anticompetitive conduct.

**Damages**

If you decide in favor of the plaintiffs on their claim, then you will go on consider the amount of damages to award to them.

If you decide in favor of the defendants on the plaintiffs' claim, then you will not consider the question of damages.

To recover damages, a plaintiff must prove by a preponderance of the evidence that it was injured by the defendants' unlawful conduct. If the plaintiff establishes this, then you will go on to consider the amount of damages to award to the plaintiff.

Each of the plaintiffs is seeking compensatory damages in the form of lost profits, as well as attorney's fees incurred in defending the patent infringement lawsuit in Nevada.

Lost profits consists of the amount by which the plaintiff's gross revenues would have exceeded all of the costs and expenses necessary to produce those revenues. This includes profits that the plaintiffs would have earned in the future. If you determine to award profits for years in the future, you must reduce the amount of any future damages to the "present value" of that amount. The reason for this is that the right to receive a certain amount of money in the future is worth less than having that same amount of money today. The present value of an amount to be obtained at a date in the future is the amount of money needed now that, when added to the interest it may be expected to earn in the future, will equal the amount to be obtained at the future date.

A plaintiff must prove by a preponderance of the evidence that it suffered damages that were proximately caused by the defendants' unlawful conduct. Conduct

21

"proximately causes" damages if, in natural or probable sequence, it produced the damages claimed.  It need not be the only cause, or the last or nearest cause.

A plaintiff must prove its damages to a reasonable certainty, as opposed to speculation or guesswork.  A plaintiff need not, however, prove the amount of damages with precision, so long as there is a reasonable basis in the evidence for an award of damages.

22

**Mitigation of damages**

The law requires an injured party to take reasonable steps to avoid further injury and thereby reduce its loss. A plaintiff may not recover damages for any portion of its losses that it could have avoided through the exercise of reasonable care and prudence. In order for you to reduce a plaintiff's damages on this basis, the defendants must prove each of the following propositions by a preponderance of the evidence:

1.      The plaintiff you are considering acted unreasonably in failing to take steps to limit its losses. A plaintiff is required to use only those measures that are reasonably practicable under the circumstances as they appeared to the plaintiff at the time.

2.      The plaintiff's failure to take these steps resulted in its losses being greater than they would have been if the plaintiff had taken these steps.

3.      The amount by which the plaintiff's losses would have been reduced if it had taken these steps.

**Final instructions**

Once you are all in the jury room, the first thing you should do is choose a presiding juror. The presiding juror should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard. You may discuss the case only when all jurors are present.

Once you start deliberating, do not communicate about the case or your deliberations with anyone except other members of your jury. You may not communicate with others about the case or your deliberations by any means. This includes oral or written communication, as well as any electronic method of communication, such as by using a telephone, cell phone, smart phone, iPhone, Android, Blackberry, or any type of computer; by using text messaging, instant messaging, the Internet, chat rooms, blogs, websites, or social media, including services like Facebook, LinkedIn, GooglePlus, YouTube, Twitter, Instagram, or SnapChat; or by using any other method of communication.

24

If you need to communicate with me while you are deliberating, send a note through the court security officer. The note should be signed by the presiding juror or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by a written note. I may have to talk to the lawyers about your message, so it may take me some time to get back to you. You may continue your deliberations while you wait for my answer.

If you send me a message, do not include the breakdown of your votes. In other words, do not tell me that you are split 6-6, or 8-4, or whatever your vote happens to be.

A verdict form has been prepared for you.  You will take this form with you to the jury room.

[Read the verdict form.]

When you have reached unanimous agreement, your presiding juror will fill in and date the verdict form, and each of you will sign it.

Advise the court security officer once you have reached a verdict.  When you come back to the courtroom, I will read the verdict aloud.

The verdict must represent the considered judgment of each juror. Your verdict must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind. Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so that there can be a unanimous verdict.

The twelve of you should give fair and equal consideration to all the evidence. You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

You are impartial judges of the facts.

**Verdict form – Case No. 15 C 3702**

We, the jury, find as follows on the claim of the plaintiffs, Shuffle Tech International, LLC, Poydras-Talrick Holdings, LLC, and Aces Up Gaming, Inc., against the defendants, Scientific Games Corp., Bally Technologies, doing business as Shuffle Master, and Bally Gaming, Inc.:

_____     for plaintiffs

_____     for defendants

**Damages**
(to be considered only if you have found for plaintiffs)

We award the plaintiffs damages in the amounts set forth below:

Shuffle Tech International, LLC:              $_____

Poydras-Talrick Holdings, LLC:              $_____

Aces Up Gaming, Inc.:                        $_____

DigiDeal Corp. (assigned to Shuffle Tech):   $_____

Sign and date the form below:

_____        _____
Presiding juror

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

Date:  August \_\_\_, 2018

28

# **Exhibit B**

JUDGMENT

Shuffle Tech Litigation

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Shuffle Tech International LLC, et al.,

Plaintiff(s),

v.

Case No. 15 C 3702
Judge Matthew F. Kennelly

Scientific Games Corporation et al.,

Defendant(s).

### JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

which ☐ includes    pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: Judgment is entered against defendants, Scientific Games Corp., Bally Technologies, d/b/a Shuffle Master and SHFL Entertainment, and Bally Gaming, Inc., jointly and severally, in favor of Shuffle Tech International, LLC in the amount of $135,000,000.00, in favor of Poydras-Talrick Holdings, LLC in the amount of $75,000,000.00, in favor of Aces Up Gaming, Inc. in the amount of $45,000,000.00, and in favor of Shuffle Tech International LLC as assignee of DigiDeal Corp. in the amount of $60,000,000.00.

---

This action was *(check one)*:

☒ tried by a jury with Judge Matthew F. Kennelly presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☐ decided by Judge    on a motion

Date: 8/7/2018                Thomas G. Bruton, Clerk of Court

                                      Pamela J. Geringer, Deputy Clerk