## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| TONKAWA TRIBE OF INDIANS OF OKLAHOMA, d/b/a TONKAWA ENTERPRISES, COW CREEK BAND OF UMPQUA TRIBE OF INDIANS, and UMPQUA INDIAN DEVELOPMENT CORPORATION, on behalf of themselves and others similarly situated, | No. 21-cv-04626 |
| Plaintiffs, | Judge John F. Kness |
| v. | |
| SCIENTIFIC GAMES CORPORATION, BALLY TECHNOLOGIES, INC., and BALLY GAMING, INC., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are casino owners and operators that leased automatic card shuffling machines from Defendants. In a separate case brought in 2018 by Defendants' competitors, a jury found that Defendants had monopolized the market for automatic card shuffling machines in the United States. Piggybacking off of that 2018 verdict, Plaintiffs filed, on behalf of themselves and a putative class, this single-count monopolization claim against Defendants. Plaintiffs allege that Defendants' anticompetitive conduct caused price injury to casino consumers like Plaintiffs.

Plaintiffs' lease agreements with Defendants included an agreement to arbitrate "any and all" disputes arising "directly or indirectly" from the leases.

Defendants filed a motion to dismiss or, in the alternative, to compel arbitration. As explained more fully below, the arbitration agreements in the parties' leases are enforceable and Plaintiffs' individual monopolization claims are arbitrable. Accordingly, Defendants' motion to compel arbitration is granted, and the case is stayed under 9 U.S.C. § 3 pending resolution of the arbitral process.

## I.    BACKGROUND

Plaintiffs are two casino owners and operators, and a third related entity. (Second Amended Complaint ("Compl."), Dkt. 39 ¶¶ 5−7.) Plaintiff Tonkawa Tribe of Indians of Oklahoma (the "Tonkawa Tribe") operates the Native Lights Casino and the Tonkawa Hotel and Casino in Oklahoma. (*Id.* ¶ 5.) Plaintiff Cow Creek Band of Umpqua Tribe of Indians (the "Umpqua Tribe") operates the Seven Feathers Casino Resort in Oregon. (*Id.* ¶ 6.) Plaintiff Umpqua Indian Development Corporation is a wholly owned subsidiary of the Umpqua Tribe. (*Id.* ¶ 7.)

Defendants are manufacturers, sellers, and lessors of equipment and games for casinos in the United States. (*Id.* ¶ 17.) In 2013, Defendant Bally Technologies ("Bally") acquired SHFL Entertainment, Inc. ("SHFL"), a manufacturer of automatic playing card shufflers and holder of hundreds of patents related to shuffler technology. (*Id.*) In 2015, Defendant Scientific Games Corporation acquired Bally. (*Id.*) Bally Gaming is a subsidiary of Bally and operates under the Scientific Games brand. (*Id.*)

According to the complaint, Defendants obtained two patents in 2003 and 2009 by fraudulently concealing known prior art from the United States Patent and

Trademark Office ("PTO"). (*Id.* ¶¶ 18–22, 40–49, 58.) Defendants then asserted the invalid patents by bringing "sham litigations" against competitors between 2003 and 2012. (*Id.* ¶¶ 2, 23, 50.) These sham lawsuits forced multiple competitors out of the relevant market, directly affecting the price of automatic playing card shufflers for customers like Plaintiffs. (*Id.* ¶ 2.)

In the first paragraph of their complaint, Plaintiffs state that "[t]his matter is closely related to an action brought against Defendants by their competitors" in *Shuffle Tech Int'l LLC et al. v. Scientific Games Corp. et al.*, No. 15-cv-3702 (N.D. Ill.). (*Id.* ¶ 1.) The *Shuffle Tech* plaintiffs sued Defendants in 2015, alleging that SHFL fraudulently obtained two patents from the PTO and enforced those patents against its competitors in violation of Section 2 of the Sherman Act. (*Id.* ¶ 23.) On August 18, 2018, a federal jury rendered a verdict against Defendants after finding that: (1) automatic card shuffling machines for regulated casinos in the United States was the relevant market; (2) Defendants had monopoly power in that market; (3) Defendants willfully acquired or maintained monopoly power by anticompetitive conduct; (4) Defendants' anticompetitive conduct occurred in or affected interstate commerce; and (5) Defendants' anticompetitive conduct harmed consumers. (*Id.* ¶ 51.)

Plaintiffs allege that, because the jury in *Shuffle Tech* found Defendants possessed monopoly power, Defendants' "anticompetitive conduct imposed antitrust injury on casino consumers of these machines" like Plaintiffs who contracted with Defendants for automatic card shuffling machines. (*Id.* ¶ 63.) The Tonkawa and

Umpqua Tribes allege not to have known about *Shuffle Tech* until June and September 2020, respectively, when "the record and judgment in *SHFL* was brought to their attention by antitrust counsel Berry Law PLLC." (*Id.* ¶ 58.) After "diligently and immediately conduct[ing] investigations," (*id.* ¶ 60) Plaintiffs filed their direct purchaser putative class action against Defendants on September 3, 2020 (*see* Dkt. 1). Plaintiffs originally filed their complaint, which has since been twice amended, in the District of Nevada. (*Id.*) In August 2021, upon an intervenor's motion (Dkt. 5), the suit was transferred to this District where at least three other related cases remain pending (Dkt. 115).

Long before this suit began, Plaintiffs entered into lease agreements with Defendants; each included an arbitration agreement. On November 20, 2013, the Tonkawa Tribe entered into a lease agreement with Bally to lease casino equipment, including automatic shufflers. (Dkt. 57, Exh. 1 (under seal).) On March 30, 2015, the Umpqua Tribe also entered into a lease agreement with Bally for the same automatic shufflers. (*Id.*, Exh. 5 (under seal).) Each lease contained an agreement to arbitrate "any and all" disputes arising out of the lease:

> 8.2 *Submission of Disputes to Binding Arbitration.* The parties agree that any and all controversies, disputes or claims of any nature arising directly or indirectly out of or in connection with this Agreement (including without limitation claims relating to the validity, performance, breach, and/or termination of this Agreement) shall be submitted to binding arbitration for final resolution. The arbitration shall follow the Commercial Arbitration Rules of the American Arbitration Association ("AAA") or other mutually agreed-upon procedures and shall be conducted in a mutually agreeable location.

(*Id.*, Exh. 1 ¶ 8.2 (under seal); *see id.*, Exh. 5 ¶ 6.6(b) (under seal).)

4

Each agreement also provided that either party to the agreement could bring an action in federal court to compel arbitration:

> 8.3 *Enforcement/Compelling Arbitration*. The parties agree that enforcement of any arbitration award, as well as any action to permit or compel arbitration, may be brought in federal or state court. If either federal or state court decline jurisdiction, then such action may be brought in Tribal Court. . . . With respect to any action to review or enforce any arbitration award, the parties agree that the standards and provisions of the Federal Arbitration Act shall apply.

(*Id.*, Exh. 1 ¶¶ 8.3−8.4 (under seal); *see id.*, Exh. 5 ¶¶ 6.6(c)−(d) (under seal).)

Plaintiffs' second amended complaint asserts that Defendants, by bringing sham lawsuits based on fraudulently procured patents, have obtained and maintained monopoly power in the United States for automatic playing card shufflers in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (Compl. ¶¶ 69–70.) Defendants jointly filed a motion to dismiss or, in the alternative, to compel arbitration. (Dkt. 49.) Since that filing, Plaintiffs moved on collateral estoppel grounds for partial summary judgment as to the monopolization claim, based on the verdict against Defendants in *Shuffle Tech*. (Dkt. 50.) Numerous other motions are also pending: Defendants have filed objections to the formerly assigned magistrate judge's order denying a motion to stay discovery pending resolution of the dispositive motions (Dkt. 98) and have moved to stay the case pending resolution of those objections (Dkt. 99); Plaintiffs have moved for appointment of interim class counsel (Dkt. 100) and to compel class discovery (Dkt. 109); and Plaintiffs have sought leave to file a second motion for summary judgment (Dkt. 135). For the reasons that follow,

Defendants' motion to compel is granted. All remaining motions are dismissed as moot, but may be refiled at a later time pending the outcome of arbitration.

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") "reflects both a liberal federal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)); *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). Under the FAA, arbitration agreements " 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010) (quoting 9 U.S.C. § 2). A court should grant a motion to compel arbitration where there is: (1) a written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing 9 U.S.C. § 4).

In general, "[t]he judiciary rather than an arbitrator decides whether a contract came into being." *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001). This reflects the basic precept that arbitration "is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (internal quotation omitted). When deciding whether to enforce an agreement to arbitrate or interpret an arbitration clause, a court must "give effect to

the contractual rights and expectations of the parties." *Id.* at 682. Accordingly, as with any other contract, the parties' intent controls. *Sphere*, 256 F.3d at 591 ("[A]s arbitration depends on a valid contract[,] an argument that the contract does not exist can't logically be resolved by the arbitrator.").

It is the burden of the party seeking to compel arbitration to show an agreement to arbitrate. 9 U.S.C. § 4; *see A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Once the party seeking to compel has shown such an agreement, the party resisting arbitration must identify a triable issue of fact as to whether the parties entered into an arbitration agreement in the first place. *See Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002). The resisting party's evidentiary burden is like that of a party opposing summary judgment. *Id.* A party cannot avoid compelled arbitration by "generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* As with summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws reasonable inferences in its favor. *Id.* If the party opposing arbitration identifies a genuine issue of fact as to whether an arbitration agreement was formed, "the court shall proceed summarily to the trial thereof." *Id.* (quoting 9 U.S.C. § 4).

## III. DISCUSSION

Defendants argue that Plaintiffs' claims are barred under the Sherman Act's four-year statute of limitations and, in the alternative, that all of Plaintiffs' claims

are subject to an arbitration agreement.[1] (Dkt. 49.) Plaintiffs do not dispute that their claims are technically time-barred; instead, Plaintiffs rely on a number of legal theories to establish that Defendants, by their conduct, prevented Plaintiffs from bringing their claims sooner. (Dkt. 54 at 2–12.) Plaintiffs assert that such conduct implicates the discovery rule as well as the doctrines of fraudulent concealment and equitable estoppel. (*Id.*) Plaintiffs also do not dispute that their lease agreements with Defendants contain "binding arbitration provisions." (*Id.* at 13.) Instead, Plaintiffs oppose arbitration on the grounds that the arbitration clauses: (1) constitute unenforceable waivers of treble damages; (2) do not cover all of Plaintiffs' individual claims; and, in the alternative, (3) do not cover class-wide claims. (*Id.* at 12–16.) As explained below, Plaintiffs' individual claims are subject to the binding and enforceable arbitration agreements. Accordingly, the Court addresses only Defendants' motion to compel and leaves questions about the viability of Plaintiffs' claims to the respective arbitrators.[2]

### A.    The Arbitration Agreement is Enforceable

Plaintiffs contend that the arbitration clauses in their lease agreements with Defendants constitute unenforceable waivers of the Clayton Act's treble-damages

---

[1] Because the case has already been transferred to this District, Defendants' argument that the case should be transferred to the Northern District of Illinois (Dkt. 49 at 19–22) is moot.

[2] Whether a statute of limitations defense applies is for the arbitrator, not the Court, to decide. *Zurich Am. Ins.*, 466 F.3d at 581 ("Procedural questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator to decide. So, too, the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability." (quoting *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84 (2002))).

provision. (*Id.* at 12–15.) Section 4 of the Clayton Act provides for the recovery of treble damages in antitrust cases. 15 U.S.C. § 15(a). Plaintiffs argue that the liability limitation sections in their lease agreements amount to a prospective waiver of statutory remedies for antitrust violations and, thus, the arbitration agreements must be voided as against public policy.

Courts, rather than arbitrators, decide "gateway matters, such as whether parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Herrington v. Waterstone Mortgage Corp.*, 907 F.3d 502, 506–07 (7th Cir. 2018) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013)). Plaintiffs do not dispute the validity of their arbitration agreements or that their claims fall within the scope of the arbitration agreements. Instead, Plaintiffs argue that "with looming antitrust exposure, the arbitration clauses imposed by Defendants (as the only sellers of the shuffle machines) are not enforceable as waivers of [the] treble-damage remedy." (Dkt. 54 at 12.) As discussed below, Plaintiffs' argument both raises a statutory waiver issue, otherwise known as the "effective vindication" exception to the FAA, and insinuates some form of coercion by Defendants.

Courts generally "give effect to the contractual rights and expectations of the parties" when enforcing or construing arbitration clauses, *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 619 (7th Cir. 2021) (cleaned up) (quoting *Stolt-Nielsen S.A.*, 559 U.S at 682), but the Supreme Court has "expressed a willingness to invalidate, on public policy grounds, arbitration agreements that operate as a

prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (cleaned up) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985)). This "judge-made" exception to the FAA, known as "effective vindication," was similarly asserted, though not actually invoked, in cases after *Mitsubishi Motors*. *See Smith*, 13 F.4th at 621 (collecting cases). More recently, the Supreme Court in *Italian Colors* likewise declined to invalidate an arbitration agreement, but explained that the "effective vindication" exception "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Italian Colors*, 570 U.S. at 236.

Although the application of the "effective vindication" exception is rare, the Seventh Circuit recently found that it applied in the case of an arbitration agreement that removed an ERISA remedy "expressly contemplated by [that statute.]" *Smith*, 13 F.4th at 621. In *Smith*, the plaintiff filed a class action complaint under ERISA seeking to remove a trustee for breach of fiduciary duties, appoint a new fiduciary, and obtain other equitable relief. *Id.* at 617. The relevant ERISA statute provides for "such other equitable or remedial relief as the court may deem appropriate, including the removal of a fiduciary." *Id.* at 621 (quoting 29 U.S.C. § 1109(a)). But the retirement plan's arbitration provision waived class actions and precluded relief that "has the purpose or effect of providing additional benefits or monetary [compensation] or other relief to any Eligible Employee, Participant or Beneficiary other than the Claimant." *Id.* at 616. As the Seventh Circuit explained, however, because the "[r]emoval of a fiduciary" is "a remedy expressly contemplated by [ERISA]" and would

10

affect the entire plan, "the plain text of [the statute] and the terms of the arbitration provision cannot be reconciled." *Id.* at 621. For this reason, and because "the plan's arbitration provision [was] nonseverable," *Smith* concluded that the arbitration provision made it impossible for the plaintiff to vindicate effectively his statutory cause of action in an arbitral forum. Accordingly, the Seventh Circuit affirmed the district court's denial of a motion to compel. *Id.* at 621–22.

Of relevance here, *Smith* limited its holding to those situations where an express conflict exists "between [the relevant statute] and the [agreement's] arbitration provision." *Id.* at 622–23. The problem with the arbitration provision in *Smith* was that the removal or appointment of a fiduciary could not have "anything *but* a plan-wide effect." *Id.* at 622. It thus would "fall[] exactly within the ambit of relief forbidden under the plan." *Id.* at 621. By precluding certain remedies that ERISA "expressly permits," the arbitration agreement in *Smith* acted "as a 'prospective waiver of [Smith's] right to pursue statutory remedies.'" *Id.* at 621, 623 (quoting *Mitsubishi Motors*, 473 U.S. at 637 n.19). *Smith* repeatedly cautioned, however, that the effective vindication exception is "rare" and applies only where the statutory language and the arbitration provision "cannot be reconciled." *Id.* at 621–22.

At issue here is the Clayton Act's mandate that a private antitrust plaintiff "*shall* recover threefold the damages by him sustained." 15 U.S.C. § 15(a) (emphasis added). Plaintiffs bring a single-count monopolization claim under federal antitrust law. And that relief, by statute, directs treble damages. Plaintiffs argue that the

liability limitation provisions in their lease agreements with Defendants conflict with the Clayton's Act treble damages mandate and thus, under the effective vindication exception, render the arbitration agreements contained within the same lease agreements unenforceable. The Tonkawa Tribe's limitation of liability section provides in relevant part:

> (c) Save for the negligent actions or omission of Bally, in no event shall Bally or any of its affiliates, subsidiaries, representatives, or agents be liable for any direct, indirect, special, incidental, or consequential damages, including loss of use or revenue.

(Dkt. 57, Exh. 1 ¶ 7.13 (under seal).)

> The Umpqua Tribe's liability limitation section similarly provides:

> (b) IN NO EVENT SHALL BALLY OR ANY OF ITS AFFILIATES, SUBSIDIARIES, REPRESENTATIVES, OR AGENTS BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF USE OR REVENUE.

(*Id.*, Exh. 5 ¶ 6.14(b) (under seal).)

Unlike *Smith*—which even the Court acknowledged was a "rare" case—it is not clear whether the liability limitation provisions in the parties' lease agreements operate as "prospective waivers" of Plaintiffs' statutory rights under the Clayton Act that would trigger the "effective vindication" exception to the FAA. These provisions exclude Defendants from liability for "any indirect, special, incidental, or consequential damages, including loss of use or revenue." And the Tonkawa Tribe's agreement also excludes Defendants from liability for "direct" damages. But whether such limitations "cannot be reconciled" with the Clayton Act's treble-damages mandate is not as clear-cut as *Smith*.

*First*, because treble damages contain both punitive and remedial elements, they are not subject to bright-line characterization as one form or another of damages. Treble damages have "a compensatory side [and] serv[e] a remedial purpose[] in addition to punitive objectives." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). And "cases have placed different statutory treble-damages provisions on different points along the spectrum between purely compensatory and strictly punitive awards." *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405 (2003); *see Webb v. Shull*, 270 P.3d 1266, 1269 (Nev. 2012) (treble damages under state statute "is not strictly punitive"). It is thus not obvious whether treble damages fall within the categories of damages listed in the limitation of liability sections to be deemed "prospectively waived" under *Smith*. *Smith*, 13 F.4th at 617.

*Second*, the parties' agreements do not expressly prohibit Plaintiffs from recovering federal statutory remedies, including treble damages, under the Clayton Act. In view of the caselaw's dynamic treatment of statutory treble damages, and given the uncertainty surrounding the language of the liability limitation provisions, the application of the Clayton Act's treble-damages provision to Plaintiffs' antitrust claims does not "fall[] exactly within the ambit of relief forbidden under the [agreement]." *See Smith*, 13 F.4th at 621. Instead, and seemingly consistent with the Clayton Act's mandate, the agreements obligate each party to "comply with all federal . . . laws" and to "remedy any violations of any such law[.]" (Dkt. 57, Exh.1 ¶ 7.1 (under seal); *id.*, Exh. 5 ¶ 6.1 (under seal).)

Under similar circumstances, the Supreme Court held that courts "should not, on the basis of 'mere speculation' that an arbitrator might interpret these ambiguous agreements in a manner that casts their enforceability into doubt, take upon [themselves] the authority to decide the antecedent question of how the ambiguity is to be resolved." *PacifiCare Health Sys., Inc.*, 538 U.S. at 406–07 (quotation omitted). As here, the contract language limiting liability in *PacifiCare* did not clearly preclude treble damages. *See id.* Because of the uncertainty over "how the arbitrator [would] construe the remedial limitations," the *PacifiCare* Court held that the "proper course [wa]s to compel arbitration." *Id.* at 407. For the same reasons, it would be "premature" to determine whether the remedial limitations in Plaintiffs' lease agreements run afoul of the treble-damages requirement. *Id.* at 404.

Plaintiffs argue that the Court should construe any ambiguity in the contracts against Defendants, as required by Nevada law—that chosen by the parties in their agreements. (Dkt. 54 at 14; *see* 57, Exh.1 ¶ 8.4; *id.*, Exh. 5 ¶ 6.6(d).) Under Nevada law, courts must construe any ambiguity against the drafter.[3] *MMAWC, LLC v. Zion Wood Obi Wan Trust*, 448 P.3d 568, 572 (Nev. 2019). To do so, Plaintiffs argue, would result in a reading of the liability limitation provisions that excludes treble damages. (Dkt. 54 at 14.)

Although courts generally enforce the choice-of-law rule selected by the parties to a contract in determining whether the parties have validly agreed to arbitration,

---

[3] In their Reply, Defendants do not dispute the assertion that they are in fact the drafters of the lease agreements. (*See* Dkt. 61.)

*Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011), the "liberal federal policy favoring arbitration agreements" applies "notwithstanding any state substantive or procedural policies to the contrary," *AT&T Mobility*, 563 U.S. at 339, 346 (quotations omitted). Because Plaintiffs do not contest the existence of an agreement to arbitrate, and regardless of whether application of Nevada law to the liability limitation provisions would in fact result in a reading that conflicts with section 4 of the Clayton Act, the Court must resolve any remaining doubts in favor of arbitration. *Moses*, 460 U.S. at 24–25; *see also Fed. Deposit Ins. Corp. v. Ernst & Young LLP*, 374 F.3d 579, 584 (7th Cir. 2004) ("[T]he validity of the waiver of punitive damages would be subject for the arbitrator rather than the court.").

Plaintiff also relies on *Kristian v. Comcast*, in which the First Circuit held that a treble-damages limitation in the parties' agreement prevented the vindication of plaintiffs' statutory rights under the Clayton Act. 446 F.3d 25, 64–65 (1st Cir. 2006). *Kristian* then applied the agreements' savings clause to sever the limitations provision before sending the parties to arbitration. Although not binding on this Court, *Kristian*, as a published opinion of the Court of Appeals, deserves close and careful consideration. But *Kristian* is factually distinguishable. Unlike here, the relevant liability limitation provisions in *Kristian* expressly precluded "treble damages." *Id.* at 44–45. In its analysis, *Kristian* acknowledged *PacifiCare*'s holding that ambiguity in the language of an arbitration agreement should be resolved by the arbitrator, not the judge. *Id.* at 37–41. But, in view of the unequivocal conflict

15

between the Clayton's Act's treble damages provision and the parties' agreement to preclude treble damages, *Kristian* applied the effective vindication exception.

Unlike the more direct conflicts in *Smith* and *Kristian*, the parties' liability limitation provisions here create only, and at most, *some* friction with the Clayton Act's treble damages mandate. Given the presumption in favor of arbitration, "[w]hether the remedial limitations at issue here prohibit an award of [statutory] treble damages is not a question of arbitrability" to be decided by the Court. *PacifiCare*, 538 U.S. at 407 n.2. Moreover, the agreements' severability clauses—providing that any provision contrary to law "shall be stricken from this Agreement but shall not affect the intention of the parties or any other provision of this Agreement" (Dkt. 57, Exh. 1 ¶ 7.6 (under seal); *id.*, Exh. 5 ¶ 6.7)—further safeguards the possibility of "prospective waiver of [Plaintiffs'] right to pursue statutory remedies," *Smith*, 13 F.4th at 621.

Plaintiffs also argue that Bally Technologies, "as the only seller of the card shuffling machines nationally with absolute dominance in the relevant market," effectively coerced Plaintiffs "to accept new binding arbitration clauses in their leases which had not been previously required." (Dkt. 54 at 13.) From this single-sentence contention, it is not clear whether Plaintiffs are raising a challenge to the arbitration agreement based on unconscionability or some other ground. Nor do Plaintiffs reconcile this point with the agreements' explicit statement that "[e]ach party has had equal bargaining power and had been represented (or has had the opportunity to be represented) by independent counsel of its own choosing." (Dkt. 57, Exh. 1 ¶ 7.12

16

(under seal); *id.*, Exh. 5 ¶ 6.13 (under seal).) Regardless, and because Plaintiffs fail to support their argument with any authority, the Court need not resolve this undeveloped argument. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

For these reasons, Plaintiffs have failed to rebut the presumption that the arbitration agreement is valid and enforceable. *See Mitsubishi Motors Corp.*, 473 U.S. at 626–27. Accordingly, the arbitration agreements are enforceable. *See Smith*, 13 F.4th at 619–20 (courts must "enforce arbitration agreements according to their terms" (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018))).

### B. All of Plaintiffs' Individual Claims are Arbitrable

Plaintiffs also argue that, even if the arbitration agreements are enforceable, certain of Plaintiffs' claims are not covered by the agreements because some of Plaintiffs' injuries accrued before the parties executed the operative lease. (Dkt. 54 at 15.) According to the complaint, Plaintiffs' antitrust injury began in April 2009. (Compl. ¶ 63.) Plaintiffs Tonkawa and Umpqua Tribes entered into the lease agreements at issue in 2013 and 2015, respectively. But Plaintiffs argue that earlier versions of their lease agreements with Shuffle Master (since acquired by Bally) did not include arbitration clauses. (Dkt. 54 at 15.) Because their lease agreements did not contain arbitration clauses before Bally acquired Shuffle Master in 2013, Plaintiffs argue, several years of the alleged leasing overcharges do not fall within the scope of their present arbitration agreements. (*Id.*)

Under the plain language of the parties' arbitration agreements, "any and all" claims against Defendants "arising directly or indirectly out of or in connection with" the lease agreements "shall be submitted to binding arbitration for final resolution." (Dkt. 57, Exh. 1 ¶ 8.2 (under seal); *id.*, Exh. 5 ¶ 6.6(b) (under seal).) Regardless of whether Plaintiffs' claims accrued before the parties signed the agreement, therefore, so long as the nature of the claims against Defendants arises directly or indirectly out of the lease, the claims are subject to binding arbitration. And even if the agreement could be clearer on that issue, any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24.

Plaintiffs' agreements also contain the following superseding clauses:

*Entire Agreement.* This Agreement contains the entire agreement between the parties and supersedes all prior agreements, understandings and negotiations, whether oral or written, concerning the same subject matter. In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of any purchase order issued by Customer, the terms and conditions of this Agreement shall control.

(Dkt. 57, Exh. 1 ¶ 7.4; *id.*, Exh. 5 ¶ 6.4.)

In the light of this language, the arbitration clause in the later, superseding contract encompasses all claims arising under an earlier agreement. Where, as here, the arbitration clause extends to disputes "arising" out of the agreement, the language is "extremely broad and capable of an expansive reach" and thus "necessarily create[s] a presumption of arbitrability." *Gore v. Alltel Commc'ns, LLC,*

666 F.3d 1027, 1034 (7th Cir. 2012) (quotation omitted). Accordingly, all of Plaintiffs' individual claims are arbitrable.

## C.  Plaintiffs' Class-Wide Claims are Not Arbitrable

Finally, should Plaintiffs' individual claims be subject to arbitration, they contend that those arbitral proceedings should be stayed pending the Court's resolution of the class claims. (Dkt. 54 at 15−16.) Plaintiffs assert that individual arbitration may be "unnecessary, or at least dramatically streamline[d,]" if the Court were first to grant partial summary judgment as to the monopolization claim under the collateral estoppel doctrine. (*Id.* at 16.) Plaintiffs specifically request that the Court first hold that the monopolization verdict against Defendants in *Shuffle Tech* precludes Defendants from relitigating Plaintiffs' class monopolization before sending the parties to arbitrate the same issue on an individual basis. Plaintiffs suggest the Court ignore the FAA's mandate to stay proceedings "upon any issue referable to arbitration," and instead prematurely resolve class claims for which the named Plaintiffs are subject to arbitration. 9 U.S.C. § 3; (*see* Dkt. 54 at 15–16.)

Whether parties have consented to class arbitration may not be inferred absent an "affirmative 'contractual basis for concluding that the part[ies] agreed to do so.' " *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quoting *Stolt-Nielsen S.A.*, 559 U.S. at 684). And, as a threshold issue of arbitrability the Court must decide, *Herrington v. Waterstone Mortg. Corp.*, 907 F.3d 502, 507 (7th Cir. 2018), it is undisputed that the parties' arbitration agreements do not provide for class arbitration; the agreements are silent on the topic (Dkt. 49 at 19; Dkt. 54 at 16). Based

on this lack of relevant language, the agreements do not provide "a sufficient basis to conclude that [the parties] agreed to 'sacrifice[] the principal advantage of arbitration' " and arbitrate on a class-wide basis. *Lamps Plus, Inc.*, 139 S. Ct. at 1416 (quoting *AT&T Mobility*, 563 U.S. at 348).

As explained above, Plaintiffs' individual claims are arbitrable. And "[f]or arbitrable issues, a § 3 stay is mandatory." *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007). Accordingly, and regardless of whether—or if—it would promote judicial economy for the Court to adjudicate issues of estoppel, the FAA requires a mandatory stay of proceedings until arbitration is complete.

*     *     *

For all the foregoing reasons, Defendants' motion to compel arbitration is granted. Plaintiffs must proceed to arbitration on an individual basis for resolution of their Section 2 monopolization claims against Defendants. *See Henderson v. U.S. Patent Comm'n, Ltd.*, 188 F. Supp. 3d 798, 810 (N.D. Ill. 2016) (granting motion to compel plaintiff "to proceed to arbitration on an individual basis" and directing that plaintiff "may not pursue class arbitration"). In accordance with the requirements of 9 U.S.C. § 3, this case is stayed pending resolution of the arbitral process.

## IV.  CONCLUSION

Defendants' motion to compel (Dkt. 49) is granted. All remaining pending motions (Dkt. 50; Dkt. 98; Dkt. 99; Dkt. 100; Dkt. 109; Dkt. 135) are dismissed without prejudice as moot. Civil case stayed.

SO ORDERED in No. 21-cv-04626.

Date: May 19, 2022

_____

JOHN F. KNESS
United States District Judge